1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   MAURICE WOODSON,                          No.  2:11-cv-1589 MCE KJN  P

12                  Plaintiff,

13          v.                                  FINDINGS AND RECOMMENDATIONS

14   P. SAHOTA, et al.,

15                  Defendants.

16

17          I.      Introduction

18          Plaintiff is a state prisoner, currently incarcerated at California State Prison-Sacramento

19   (CSP-SAC).  Plaintiff proceeds pro se and in forma pauperis in this civil rights action filed

20   pursuant to 42 U.S.C. § 1983, premised on plaintiff's Eighth Amendment claims that defendant

21   was deliberately indifferent to plaintiff's serious medical needs.  Pending before the court is

22   defendant Nangalama's motion for summary judgment, filed August 10, 2015.  The motion is

23   fully briefed.  For the reasons that follow, the undersigned recommends that defendant's motion

24   for summary judgment be granted in part and denied in part.

25          II.     Plaintiff's Allegations

26          This action proceeds on plaintiff's first amended complaint, filed on March 11, 2013.

27   (ECF No. 15.)  Plaintiff contends that defendant Dr. Nangalama, plaintiff's treating physician at

28   CSP-SAC, was deliberately indifferent to plaintiff's serious medical needs associated with

                                              1

1    plaintiff's high blood pressure and chronic elbow pain.  Specifically, plaintiff alleges that

2    defendant left him on an ineffective regimen of high blood pressure medication for eight months

3    to one year, causing plaintiff to experience elevated blood pressure, headaches, and pain behind

4    his eyes.  Plaintiff further alleges that defendant discontinued his pain medication (tramadol) and

5    prescribed him an alternate medication (ibuprofen), to which he is allergic.  Plaintiff alleges that

6    defendant thereafter failed to prescribe medication that adequately managed plaintiff's chronic

7    pain.

8        III.    Summary Judgment Standard

9        Summary judgment is appropriate when it is demonstrated that the standard set forth in

10   Federal Rule of Civil procedure 56 is met.  "The court shall grant summary judgment if the

11   movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

12   judgment as a matter of law."  Fed. R. Civ. P. 56(a).

13       "[T]the moving party always bears the initial responsibility of informing the district court

14   of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers

15   to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes

16   demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S.

17   317, 323 (1986) (quoting then-numbered Fed. R. Civ. P. 56(c)).  "Where the nonmoving party

18   bears the burden of proof at trial, the moving party need only prove that there is an absence of

19   evidence to support the non-moving party's case."  Nursing Home Pension Fund, Local 144 v.

20   Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex

21   Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 advisory committee's notes to 2010

22   amendments (recognizing that "a party who does not have the trial burden of production may rely

23   on a showing that a party who does have the trial burden cannot produce admissible evidence to

24   carry its burden as to the fact").  Indeed, summary judgment should be entered, after adequate

25   time for discovery and upon motion, against a party who fails to make a showing sufficient to

26   establish the existence of an element essential to that party's case, and on which that party will

27   bear the burden of proof at trial.  Celotex Corp., 477 U.S. at 322.  "[A] complete failure of proof

28   concerning an essential element of the nonmoving party's case necessarily renders all other facts

1  immaterial."  Id. at 323.

2      Consequently, if the moving party meets its initial responsibility, the burden then shifts to

3  the opposing party to establish that a genuine issue as to any material fact actually exists.  See

4  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

5  establish the existence of such a factual dispute, the opposing party may not rely upon the

6  allegations or denials of its pleadings, but is required to tender evidence of specific facts in the

7  form of affidavits, and/or admissible discovery material in support of its contention that such a

8  dispute exists.  See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party

9  must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

10  of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

11  (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

12  1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return

13  a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436

14  (9th Cir. 1987), overruled in part on other grounds, Hollinger v. Titan Capital Corp., 914 F.2d

15  1564, 1575 (9th Cir. 1990).

16      In the endeavor to establish the existence of a factual dispute, the opposing party need not

17  establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

18  dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

19  trial."  T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary judgment is to 'pierce

20  the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

21  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963

22  amendments).

23      In resolving a summary judgment motion, the court examines the pleadings, depositions,

24  answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R.

25  Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at

26  255.  All reasonable inferences that may be drawn from the facts placed before the court must be

27  drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.  Nevertheless, inferences

28  are not drawn out of the air, and it is the opposing party's obligation to produce a factual

1   predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F.

2   Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to

3   demonstrate a genuine issue, the opposing party "must do more than simply show that there is

4   some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could

5   not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for

6   trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

7           IV.     Plaintiff's Objections

8           Plaintiff's Deposition Transcript

9           In his opposition to defendant's motion for summary judgment, plaintiff alleges that

10  defendant failed to provide plaintiff with a copy of his deposition transcript and failed to send a

11  complete copy of the deposition transcript to the court as required by Local Rule 133(j).  (ECF

12  No. 45 at 13-15.)  Plaintiff alleges that he requested the entire transcript from defendant, but

13  defendant refused to provide it to him.  Defendant also "told [plaintiff] (incorrectly) that he could

14  read the entirety of the transcript before plaintiff sign[ed] it."  (Id. at 14-15.)  Plaintiff contends

15  that "the prejudice to plaintiff is clear."  (Id.)

16          Plaintiff is advised that defendant is not required to provide plaintiff with a free copy of

17  his deposition transcript.  See Whittenberg v. Roll, No. CIV S-04-2313 FCD JFM P, 2006 WL

18  657381 at *5 (E.D. Cal. Mar. 15, 2006) (denying plaintiff's motion to compel defendant to

19  provide him with a copy of the deposition transcript free of charge).  Although granted leave to

20  proceed in forma pauperis, "'the expenditure of public funds [on behalf of an indigent litigant] is

21  proper only when authorized by Congress.'"  Tedder v. Odel, 890 F.2d 210, 211 (9th Cir. 1989)

22  (quoting United States v. MacCollom, 426 U.S. 317, 321 (1976)).  The expenditure of public

23  funds for deposition transcripts is not authorized by the in forma pauperis statute or any other

24  statute.  See 28 U.S.C. § 1915.

25          Moreover, under Rule 30(f)(3) of the Federal Rules of Civil Procedure, the officer before

26  whom a deposition is taken must retain stenographic notes of the proceedings or a copy of the

27  recording of a deposition taken by different method.  The officer must also provide a copy of the

28  transcript to any party or to the deponent upon payment of reasonable charges therefor.

4

1   Generally, courts will not order defense counsel or a defendant to provide plaintiff with a copy of

2   the plaintiff's deposition transcript.  Rather, a plaintiff must obtain it from the officer before

3   whom the deposition was taken.  See Claiborne v. Battery, No. CIV S–06–2919 FCD EFB, 2009

4   WL 530352 at *3 (E.D. Cal. Mar. 3, 2009) (denying plaintiff's request for a court order directing

5   the defendant to provide him with a copy of his deposition transcript); Brown v. Castillo, No. CV

6   F–02–6018 AWI DLB, 2006 WL 1408452 at *1 (E.D. Cal. May 22, 2006) (same).

7          Finally, Local Rule 133(j) does not require defendant to send plaintiff a copy of the entire

8   deposition if the entire deposition was submitted to the court in hard copy.  Local Rule 133(j)

9   provides as follows:

> Before or upon the filing of a document making reference to a deposition, counsel relying on the deposition shall ensure that a courtesy hard copy of the entire deposition so relied upon has been submitted to the Clerk for use in chambers. Alternatively, counsel relying on a deposition may submit an electronic copy of the deposition in lieu of the courtesy paper copy to the email box of the Judge or Magistrate Judge and concurrently email or otherwise transmit the deposition to all other parties.  Neither hard copy nor electronic copy of the entire deposition will become part of the official record of the action absent order of the Court. Pertinent portions of the deposition intended to become part of the official record shall be submitted as exhibits in support of a motion or otherwise. See L.R. 250.1(a).

17          Plaintiff is advised that defendant provided the court with a hard copy of plaintiff's entire

18   deposition taken on April 9, 2015.  Defendant also attached the pertinent portions of plaintiff's

19   deposition as an exhibit to his motion for summary judgment.[1]  (See ECF No. 39-6.)  Thus,

20   defendant has complied with Local Rule 133(j).  To the extent plaintiff contends that defendant

21   violated Local Rule 133(j), plaintiff's argument is without merit.

22          *Declaration of Dr. Bruce Barnett*

23          In support of his motion for summary judgment, defendant Nangalama submits the

24   declaration of Dr. Bruce Barnett, Chief Medical Officer for the California Correctional Health

25   Care Services, Office of Legal Affairs.  (ECF No. 39-3 (Declaration of Dr. Bruce Barnett)

26

27   ───────────────

[1] Defendant's motion for summary judgment was served on plaintiff by defendant on August 10, 2015, and by the court on December 1, 2015, after plaintiff appeared to allege that he no longer

28   had a copy of defendant's motion.  (ECF No. 44.)

1   ("Barnett Declr.").)  Plaintiff argues in his opposition that the court should not consider Dr.

2   Barnett's declaration as evidence because Dr. Barnett's statements are not based on personal

3   knowledge.  (ECF No. 45 at 15.)  Specifically, plaintiff takes issue with the following statement

4   in Dr. Barnett's declaration:  "It is further my opinion that plaintiff suffered no harm or injury as a

5   result of action of lack of action by Dr. Nangalama in providing the medical care at issue."  (See

6   Barnett Declr. at 6.)

7          The court first notes that while Dr. Barnett was not explicitly designated as defendant's

8   expert witness, Dr. Barnett's training and experience, his detailed review of plaintiff's medical

9   record, and his professional medical opinion based thereon, render him an expert witness within

10  the meaning of Rule 702, Federal Rules of Evidence.  While Dr. Barnett's professional

11  responsibilities include oversight of CDCR's medical services, such as those provided by

12  defendant, Dr. Barnett has been accorded expert witness status in numerous civil rights actions

13  filed by prisoners in this court.  See Elliott v. Tseng, No. 2:11-CV-03118 KJM, 2014 WL

14  3966377, at *5 (E.D. Cal. Aug. 13, 2014) (collecting cases).  Accordingly, the undersigned treats

15  Dr. Barnett's professional opinions as those of an expert medical witness.

16         The Federal Rules of Evidence authorize the opinion testimony of an expert witness who

17  has the requisite "knowledge, skill, experience, training or education" to form a specialized

18  opinion. Fed. R. Evid. 702.  "An expert may base an opinion on facts or data in the case that the

19  expert has been made aware of or personally observed.  If experts in the particular field would

20  reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not

21  be admissible for the opinion to be admitted." Fed. R. Evid. 703.  Dr. Barnett's opinion is

22  properly based on his professional experience, knowledge, and his review of plaintiff's medical

23  records, without conducting an interview or examination of plaintiff.  Accordingly, plaintiff's

24  objection to Dr. Barnett's declaration is overruled.

25         V.     Eighth Amendment Standard

26         Generally, deliberate indifference to a serious medical need presents a cognizable claim

27  for a violation of the Eighth Amendment's prohibition against cruel and unusual punishment.

28  Estelle v. Gamble, 429 U.S. 97, 104 (1976.)  According to Farmer v. Brennan, 511 U.S. 825, 947

1    (1994), "deliberate indifference" to a serious medical need exists "if [the prison official] knows

2    that [the] inmate [] face[s] a substantial risk of serious harm and disregards that risk by failing to

3    take reasonable measures to abate it."  The deliberate indifference standard "is less stringent in

4    cases involving a prisoner's medical needs than in other cases involving harm to incarcerated

5    individuals because 'the State's responsibility to provide inmates with medical care does not

6    conflict with competing administrative concerns." McGuckin v. Smith, 974 F.2d 1050, 1060 (9th

7    Cir. 1992) (quoting Hudson v. McMillian, 503 U.S. 1, 6 (1992)), overruled on other grounds by

8    WMX Technologies, Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997).

9         Specifically, a determination of "deliberate indifference" involves two elements:  (1) the

10   seriousness of the prisoner's medical needs; and (2) the nature of the defendant's responses to

11   those needs. McGuckin, 974 F.2d at 1059.

12        First, a serious medical need exits if the failure to treat a prisoner's condition could result

13   in further significant injury or the "unnecessary and wanton infliction of pain." Id. (citing Estelle,

14   429 U.S. at 104).  Examples of instances where a prisoner has a "serious" need for medical

15   attention include the existence of an injury that a reasonable doctor or patient would find

16   important and worthy of comment or treatment; the presence of a medical condition that

17   significantly affects an individual's daily activities; or the existence of chronic and substantial

18   pain. McGuckin, 974 F.2d at 1059-60 (citing Wood v. Housewright, 900 F.2d 1332, 1337-41

19   (9th Cir. 1990)).

20        Second, the nature of a defendant's response must be such that the defendant purposefully

21   ignores or fails to respond to a prisoner's pain or possible medical need in order for "deliberate

22   indifference" to be established. McGuckin, 974 F.2d at 1060.  Deliberate indifference may occur

23   when prison officials deny, delay or intentionally interfere with medical treatment, or "may be

24   shown by the way in which prison physicians provide medical care." Hutchinson v. United

25   States, 838 F.2d 390, 394 (9th Cir. 1988).  In order for deliberate indifference to be established,

26   there must first be a purposeful act or failure to act on the part of the defendant and resulting

27   harm. See McGuckin, 974 F.2d at 1060.  "A defendant must purposefully ignore or fail to

28   respond to a prisoner's pain or possible medical need in order for deliberate indifference to be

1  established." Id.  Second, there must be resulting harm from the defendant's activities.  (Id.)  The

2  needless suffering of pain may be sufficient to demonstrate further harm.  Clement v. Gomez, 298

3  F.3d 898, 904 (9th Cir 2002).

4          Whether a defendant had requisite knowledge of a substantial risk of harm is a question of

5  fact.  "[A] factfinder may conclude that a prison official knew of a substantial risk from the very

6  fact that the risk was obvious.  The inference of knowledge from an obvious risk has been

7  described by the Supreme Court as a rebuttable presumption, and thus prison officials bear the

8  burden of proving ignorance of an obvious risk. . . . [D]efendants cannot escape liability by virtue

9  of their having turned a blind eye to facts or inferences strongly suspected to be true . . . ."

10  Coleman v. Wilson, 912 F. Supp. 1282, 1316 (E.D. Cal. 1995) (citing Farmer, 511 U.S. at 842-

11  43) (internal quotation marks omitted).

12          When the risk is not obvious, the requisite knowledge may still be inferred by evidence

13  showing that the defendant refused to verify underlying facts or declined to confirm inferences

14  that he strongly suspected to be true.  Farmer, 511 U.S. at 842.  On the other hand, prison officials

15  may avoid liability by demonstrating "that they did not know of the underlying facts indicating a

16  sufficiently substantial danger and that they were therefore unaware of a danger, or that they

17  knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise

18  was insubstantial or nonexistent."  Id. at 844.  Thus, liability may be avoided by presenting

19  evidence that the defendant lacked knowledge of the risk and/or that his response was reasonable

20  in light of all the circumstances.  Id. at 844-45; see also Wilson v. Seiter, 501 U.S. 294, 298

21  (1991); Thomas v. Ponder, 611 F.3d 1144, 1150-51 (9th Cir. 2010).

22          A physician need not fail to treat an inmate altogether in order to violate that inmate's

23  Eighth Amendment rights.  Ortiz v. City of Imperial, 884 F.2d 1312, 1314 (9th Cir.1989).  A

24  failure to *competently* treat a serious medical condition, even if some treatment is prescribed, may

25  constitute deliberate indifference in a particular case.  Id.  However, "[a] difference of opinion

26  between a physician and the prisoner – or between medical professionals – concerning what

27  medical care is appropriate does not [without more] amount to deliberate of indifference."  Snow

28  v. McDaniel, 681 F.3d 978, 987 (9th Cir. 2012), overruled on other grounds, Peralta v. Dillard,

744 F.3d 1076, 1083 (9th Cir. 2014).  To establish that the difference of opinion rises to the level

of deliberate indifference, a prisoner must show that the defendant's chosen course of treatment

was medically unacceptable and in conscious disregard of an excessive risk to plaintiff's health.

Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996).

In order to defeat defendant's summary judgment motion, plaintiff must "produce at least

some significant probative evidence tending to [show]," T.W. Elec. Serv., 809 F.2d at 630, that

defendant's actions, or failure to act, were "in conscious disregard of an excessive risk to

plaintiff's health."  Jackson v. McIntosh, 90 F.3d at 332 (citing Farmer, 511 U.S. at 837).

VI.     Arguments of the Parties

Defendant argues that he is entitled to summary judgment because he provided reasonable

and medically acceptable medical care to plaintiff with respect to plaintiff's high blood pressure

and pain management issues.  (ECF No. 39-1.)  To the extent plaintiff claims that defendant

should not have discontinued his prescriptions for clonidine (for hypertension) and tramadol (for

pain), defendant contends that plaintiff's personal preference for specific medications is not

controlling and does not suggest that defendant was deliberately indifferent to plaintiff's serious

medical needs.  (See ECF Nos. 39-1 & 46.)

Plaintiff argues that defendant acted with deliberate indifference by changing his blood

pressure medications and stopping his clonidine prescription, which plaintiff alleges is the

"primary" medication that keeps his blood pressure down.  (ECF No. 45.)  As to his pain

management claims, plaintiff argues that defendant acted with deliberate indifference by

discontinuing his tramadol prescription and instead prescribing ibuprofen and acetaminophen.

Plaintiff claims that he is allergic to ibuprofen and that acetaminophen did not adequately manage

his chronic pain.  (Id.)

VII.    Undisputed Facts

The court has reviewed defendant's Statement of Undisputed Facts (ECF No. 39-2),

plaintiff's "Statement of Undisputed Facts" (ECF No. 45 at 20-23), and defendant's various

declarations and deposition transcripts together with the record evidence.  The following facts are

undisputed by the parties or, following the court's review, have been deemed undisputed for

1    purposes of the pending motion.

2            *Facts Related to High Blood Pressure Claim*

3        Plaintiff suffers from chronic hypertension (high blood pressure), hyperlipidemia, and

4 chronic kidney disease.  (ECF No. 39-5 at 10.)  Plaintiff's medical records indicate that plaintiff

5 has a history of hypertension since he was twelve years old.  (Id. at 74.)

6        Until recently, ideal blood pressure ("BP") was 120/80.[2]  (Barnett Declr. at 7.)  Blood

7 pressure of 130-140/90 is borderline or pre-hypertensive pressure and blood pressure as high as

8 140/90 was considered elevated.  Recently, it has been determined that blood pressure as high as

9 150/90 is safe in patients over age sixty.  (Id.)

10        On May 17, 2001, a physician wrote a progress note reporting that plaintiff stated, "I

11 haven't had any high blood pressure medications for two weeks."  (ECF No. 39-5 at 5.)  The

12 progress note further reads, "[plaintiff's] prescriptions lapsed two weeks ago, did not request refill

13 until now."  (Id.)

14        In a progress note dated October 14, 2004, plaintiff's blood pressure is described as

15 "poorly controlled."  (Id. at 6.)

16        On March 29, 2006, plaintiff was seen in the nephrology clinic for evaluation of his

17 chronic kidney disease.  (Id. at 7.)  The report notes plaintiff's twenty-year history of

18 hypertension and hyperlipidemia.  The assessment indicates that plaintiff has stage II chronic

19 kidney disease and that "the patient will benefit from optimization of his blood pressure."

20 Plaintiff's blood pressure was recorded as 140/100 and described as elevated.  (Id.)  The

21 physician further noted that plaintiff's blood pressure medications would be adjusted.  (Id. at 8.)

22        Defendant Nangalama treated plaintiff in 2010 and 2011, but was not the only physician

23 to treat plaintiff during this time.  (ECF No. 39-7 at 3 (Declaration of A. Nangalama, M.D.)

24 ("Nangalama Declr.").)

25        On January 10, 2010, plaintiff was seen by non-party Dr. Richards at an outside medical

26 facility for issues related to plaintiff's hypertension.  (ECF No. 39-5 at 18-19.)  The "emergency

27

28    [2] The higher number describes the blood leaving the heart on contraction and the lower number is the pressure of blood in the arteries between beats.  (Barnett Declr. at 7.)

10

department physician note" in plaintiff's medical file indicates that plaintiff's medications had

run out in prison one week prior and that plaintiff had been "off antihypertensives for 1 week."

(Id. at 18.)  The report states that one week prior, plaintiff had been on clonidine 0.3 mg PO BID,

HTCZ 37.6/25 mg PO daily, enlapril 15 mg PO daily, norvasc 5 mg PO daily, and metoprolol 50

mg PO QHS.  (Id.)  The report notes that on January 9, 2010, plaintiff was restarted on HCTZ at

the same dose, norvasc was increased, metoprolol was increased, lisinpril was prescribed instead

of enlapril, and clonidine was stopped.  (Id.)  The report states that in the past, plaintiff had been

on clonidine with doses as high as 0.5 mg PO BID.  The report indicates that plaintiff was sent in

for the current assessment by prison staff after plaintiff had taken several doses of hydralazine

and "one day of his rearranged medications with his hypertension poorly controlled with SBPs in

the 180s."  (Id.)  Under "initial assessment and plan," the report states:

> Hypertension: This is the result of not having taken his regular medication regimen in the last week and possibly related to clonidine withdrawal as well.  However, in an attempt to respect his prison physician's effort to stop clonidine,[3] we will first try captopril then with plans to switch to lisinopril . . . hydralazine will also be added.  Goal is to reduce SBP to below 160 prior to discharge.

(Id. at 19.)

On February 10, 2010, defendant ordered lab tests for plaintiff.  (Id. at 23.)  Plaintiff's

creatinine level was 2.0, indicating renal impairment.[4]  (Barnett Declr. at 9.)

---

[3] It is not clear whether the prison physician referred to here is defendant Nangalama.  The allegations contained in plaintiff's administrative grievances suggest that it was Dr. Sahota who initially changed plaintiff's blood pressure medications in January 2010.  Dr. Sahota has been dismissed as a defendant in this lawsuit.

[4] In his declaration, Dr. Barnett explains:

> Creatinine is a chemical formed by muscle use and in proportion to muscle mass which is eliminated from the body by normal kidney function.  A relatively high level of creatinine suggests an impairment in the kidney's ability to excrete creatinine and a compromise in kidney (renal) function.  A normal creatinine level in the blood for adult males is 1.2 or lower.  However, men with substantial muscle mass and African American males tend to have higher creatinine.  A creatinine over 1.6 in nearly all cases indicates compromised kidney function.

(Barnett Declr. at 8.)

On February 11, 2010, defendant added "renal insufficiency" and "hypertension" to the "problem list" in plaintiff's medical file.  (ECF No. 39-5 at 24.)  Plaintiff's hypertension was described as "well controlled."  (Id.)  On the same date, defendant also adjusted plaintiff's blood pressure medications.  (Id. at 25.)

On March 8, 2010, defendant ordered a lab test for plaintiff.  Plaintiff's creatinine level was 1.6, indicating an improvement in renal function.  (Barnett Declr. at 9.)

On April 2, 2010, defendant refilled plaintiff's blood pressure medications.  (ECF No. 39-5 at 26.)

On April 13, 2010, plaintiff's blood pressure was 165/118.  (ECF No. 39-5 at 27.)  In a progress note in plaintiff's medical file, defendant wrote that plaintiff had not been taking all of his medications and that his blood pressure remained elevated.  (Id.)  Defendant elected to continue plaintiff's prescribed blood pressure medications, but to increase lisinopril.  (Id.)

On April 26, 2010, defendant requested a renal ultrasound to investigate plaintiff's poorly controlled hypertension.  (Id. at 29; Barnett Declr. at 10.)

On April 27, 2010, defendant requested a nephrology consultation to investigate plaintiff's kidney function deterioration and resistant hypertension.[5]  (ECF No. 39-5 at 30, Barnett Declr. at 10.)

On May 26, 2010, plaintiff was seen by Dr. Ali.[6]  (ECF No. 39-5 at 34.)  Dr. Ali noted that plaintiff had not been taking his blood pressure medications regularly because "it is not doing good."  (Id.)  Dr. Ali wrote that plaintiff's hypertension was uncontrolled because of medication noncompliance.  (Id.)  Dr. Ali further indicated that lab tests would be done to check plaintiff's kidney function and plaintiff would be started back on hydrochlorothiazide.  (Id.; Barnett Declr. at 11.)

On June 24, 2010, defendant wrote in a progress note that plaintiff's hypertension was improving with his current medications.  (Id. at 37; Barnett Declr. at 12.)  Plaintiff's creatinine

---

[5] Defendant's request for a nephrology consultation was later denied.  (ECF No. 39-5 at 30; Barnett Declr. at 10.)

[6] Dr. Ali has been dismissed as a defendant in this action.

1    level was 1.53.  (Id.)

2         On July 29, 2010, plaintiff's blood pressure was "abnormal" at 166/109 and 163/113.

3    (ECF No. 39-5 at 42; Barnett Declr. at 12.)

4         On July 30, 2010, plaintiff saw Dr. Ali.  (ECF No. 39-5 at 43.)  The progress note states

5    that plaintiff was brought to the clinic for high blood pressure (174/115).  (Id.)  Dr. Ali wrote that

6    plaintiff has a "history of noncompliance of meds."  (Id.)  The report indicates that plaintiff's

7    blood pressure would be checked again later that day and more medication would be added if

8    necessary.  (See id.)

9         On August 16, 2010, plaintiff's BP was 145/95.  (Id. at 44.)  Defendant wrote in a

10   progress note that plaintiff's blood pressure remained elevated.  (Id.)  Defendant noted that he

11   discussed plaintiff's medications and medical records with plaintiff, and that plaintiff's current

12   medication would be continued.  (See id.)

13        On September 8, 2010, plaintiff's BP was 139/84.  (Id. at 46.)  Defendant wrote in a

14   progress note that plaintiff's hypertension was well controlled.  (Id.)

15        On September 13, 2010, plaintiff's BP was 156/116.  (Id. at 49.)  Dr. Duc[7] wrote in a

16   progress note that plaintiff's hypertension was not under control and that clonidine would be

17   added to plaintiff's medication regimen.   (Id.)  Dr. Duc prescribed plaintiff clonidine 0.2 mg for

18   90 days.  (Id. at 50.)

19        On October 18, 2010, plaintiff's blood pressure was recorded as 130/73 and 128/83.  (Id.

20   at 51.)

21        On November 18, 2010, defendant refilled plaintiff's blood pressure medication, including

22   amlodipine, clonidine, hydralazine, lisinopril, and metoprolol.  (Id. at 52.)

23        On January 21, 2011, defendant continued plaintiff's blood pressure medications,

24   including amlodipine, clonidine, hydralazine, hydrochlorothiazide, lisinopril, and metoprolol.

25   (Id. at 53.)

26        On February 24, 2011, defendant wrote in a progress note that plaintiff's hypertension was

27

28   _____

[7] Dr. Duc has been dismissed as a defendant in this action.

13

1  well controlled.  (Id. at 54.)  Defendant refilled plaintiff's blood pressure medications, including

2  amlodipine, clonidine, hydrochlorothiazide, lisinopril, and metoprolol.  (Id.)

3      On April 8, 2011, plaintiff's BP was 121/73.  (Id. at 56.)  Defendant wrote in a progress

4  note that plaintiff's blood pressure was well controlled.  (Id.)

5      On June 13, 2011, defendant renewed plaintiff's prescriptions for hydralazine,

6  hydrochlorothiazide, and amlodipine.  (Id. at 58.)  Plaintiff was not taking clonidine at this time.

7  (See id.; Barnett Declr. at 14.)

8      On June 30, 2011, plaintiff was seen by defendant.  (ECF No. 39-5 at 59.)  Plaintiff's

9  blood pressure was 126/81.  (Id.)  Defendant wrote in a progress note that plaintiff's hypertension

10  was "very well controlled."  (Id.)  Defendant noted that plaintiff wanted clonidine resumed, but

11  defendant declined to prescribe clonidine.  (Id.)  Defendant wrote that plaintiff "got very angry

12  and walked out."  (Id.)

13      On August 5, 2011, plaintiff saw Dr. Dhillon.  (Id. at 60.)  Plaintiff's blood pressure was

14  143/103.  (Id.)  Dr. Dhillon wrote in a progress note that plaintiff wanted to be put back on

15  clonidine and was "very persistent about clonidine."  (Id.)  Dr. Dhillon noted that plaintiff's

16  hypertension had been logged as high as 160/100, and that he had a long discussion with plaintiff

17  and tried to educate him.[8]  (Id.)  Plaintiff still wanted to be put on clonidine.  (See id.)

18      On August 10, 2011, Dr. Dhillon prescribed plaintiff clonidine 0.1 mg, ½ tab to be taken

19  twice daily.  (Id. at 61.)

20      On August 25, 2011, plaintiff was seen in the dental clinic by Dr. Kaur.  (Id. at 62.)  Dr.

21  Kaur noted that plaintiff's blood pressure was "very high."  (Id.)  The report states that defendant

22  Nangalama came to see plaintiff in the dental clinic and "wanted to do follow up on him."  (Id.)

23  Plaintiff was given clonidine 0.2 mg in the medical clinic.  (Id.)  On the same date, defendant

24  wrote in a progress note that he was called to the dental clinic to evaluate plaintiff due to elevated

25  blood pressure.  (Id. at 63.)  Defendant wrote that plaintiff's hypertension was poorly controlled

26  and that he would increase clonidine to 0.1 mg twice daily and continue plaintiff's other

27

28  [8] Dr. Barnett explains in his declaration that Dr. Dhillon was attempting to educate plaintiff about
the risk of rebound hypertension associated with clonidine.  (Barnett Declr. at 14.)

1   medications.  (Id.)

2        On September 21, 2011, plaintiff saw defendant for a chronic care follow up visit.  (Id. at

3   66.)  Plaintiff's blood pressure was elevated.  (Id.)  Defendant noted that plaintiff believed his

4   blood pressure was elevated because some of his medications for hypertension were discontinued.

5   The report also states that plaintiff has a known history of noncompliance with his medications in

6   the past.  (Id.)  Defendant wrote that plaintiff's amlodipine and hydrochlorothiazide would be

7   continued and that clonidine would be increased from 0.1 mg to 0.2 mg to be taken twice per day.

8   (Id.)

9        Plaintiff's blood pressure was checked on September 24, 2011 and recorded as 144/90.

10  On October 1, 2011, plaintiff's blood pressure was 160/90.  (Barnett Declr. at 15.)

11       On October 26, 2011, plaintiff was seen by defendant.  (ECF No. 39-5 at 70.)  Defendant

12  noted in the report that plaintiff had "been on multiple medications for his blood pressure, but the

13  blood pressure is not well controlled."  (Id.)  Defendant also wrote, "[plaintiff] states that he takes

14  his medications regularly, but I think [plaintiff] is noncompliant with his medications, and I think

15  he does not take his medications on some occasions."  (Id.)  Defendant noted that plaintiff's blood

16  work was normal but there was elevated protein in his urine, and that defendant would refer

17  plaintiff to a nephrologist.  (Id.)  Defendant also adjusted plaintiff's blood pressure medications

18  by adding lisinopril.  (Id.)

19       On December 1, 2011, plaintiff saw Dr. Wedell.  (Id. at 72.)  Plaintiff's blood pressure

20  was 159/100.  (Id.)  The report notes that plaintiff wants to stay on clonidine.  (Id.)  Under

21  "assessment," the report states "treatment-resistant HTN."  (Id.)  The plan is to add lisinopril and

22  metoprolol, and to wean plaintiff off clonidine when his blood pressure is stable.  (See id.; Barnett

23  Declr. at 16.)

24       On December 8, 2011, plaintiff's blood pressure was 132/93.  (ECF No. 39-5 at 73.)  A

25  physician's assistant noted, "HTN fair control, improving since on new meds."  (Id.)

26       On December 16, 2011, plaintiff saw Dr. Dhillon.  (Id. at 74.)  Plaintiff's blood pressure

27  was 125/88.  (Id.)  The report states that plaintiff "reports that his current medications [are]

28  working for him and he does not need any adjustment of medication.  He feels that adjusting his

1    medication has alleviated his renal problems."  (Id.)  Under "assessment," Dr. Dhillon wrote,

2    "hypertension with good degree of control and stable clinical trend.  Continue with current

3    regimen."  (Id.)  Plaintiff's medications on this date included: amlodipine, augmentin, aspirin,

4    clonidine, flunisolide, hydrochlorothiazide, lisinopril, metoprolol, and statin.[9]  (Id.)

5         Plaintiff submitted a healthcare appeal regarding his blood pressure medications, which

6    was assigned appeal log number SAC HC 11025315.[10]  (ECF No. 15 at 61.)  The appeal states

7    that on October 26, 2011, plaintiff saw defendant Nangalama regarding his blood pressure

8    checks.  Plaintiff alleged that the reason his blood pressure was high was because defendant

9    Nangalama, Dr. Sahota, and Dr. Dhillon took plaintiff off his blood pressure medication that

10   worked for him and put him on medications that did not work.  Plaintiff alleged that defendant

11   Nangalama said he would reorder plaintiff's blood pressure checks, but failed to do so.

12   Defendant also stated he would start giving plaintiff one of his old medications (enalapril) and

13   refer plaintiff to a kidney specialist, but Dr. Sahota denied all the orders, including the specialist

14   request.  (Id. at 61-63.)

15        On February 3, 2012, plaintiff's appeal log SAC HC 11025315 was denied at the first

16   level of review.  (ECF No. 15 at 67.)  The reviewer responded:

17            You are already on a medication similar to Enalapril.  We planned
              to perform tests after stopping the medication but you did not stop
18            taking the medication.  You are not compliant with medical advice.
              Tests are ordered to re-evaluate your kidney function.  You are not
19            being treated with medications that cause you harm.

20   (Id.)

21        On March 7, 2012, plaintiff's appeal SAC HC 11025315 was partially granted at the

22   second level of review.  (Id. at 65-66.)  The response to the appeal notes in relevant part that

23   plaintiff's blood pressure "improved with medication" and that plaintiff was now using

24   amlodipine, clonidine, hydrochlorothiazide, metoprolol, and lisinopril to control his blood

25   _____

26   [9] Statin was prescribed for plaintiff's hyperlipidemia and augmentin was prescribed to treat a
     wound.  (ECF No. 39-5 at 74.)

27   [10] It is not entirely clear when plaintiff's healthcare appeal was submitted.  (See ECF No. 15 at

28   61-63.)

pressure.  (Id. at 66.)

On July 9, 2012, plaintiff's appeal SAC HC 11025315 was denied at the third level of review.  Id. at 71.

Defendant Nangalama's Declaration

In support of his summary judgment motion, defendant provides his own declaration, in which he declares as follows:

- When defendant treated plaintiff in 2010 and 2011, he selected medications for plaintiff that he felt were in plaintiff's best interest, based on defendant's training and experience.  (Nangalama Declr. at 3.)
- When plaintiff's blood pressure seemed to not be well controlled by his medications, defendant elected to try another regime of blood pressure medications to improve his condition.  (Id. at 5.)
- In defendant's medical opinion, changing blood pressure medications at times was in plaintiff's best interest because his blood pressure was difficult to control.  (Id.)
- It is normal to change a patient's medication when one is not achieving the desired results with the medication.  (Id.)

Dr. Barnett's Declaration

Dr. Barnett, defendant's medical expert, declares as follows:

- In Dr. Barnett's opinion, the blood pressure medications ordered and renewed by defendant Nangalama were effective.  (Barnett Declr. at 17.)  There is no indication that the drugs defendant chose were ineffective.  (Id.)  The times when plaintiff's blood pressures were most seriously elevated were episodes when physicians documented that plaintiff had not been taking any medications at all. (Id.)
- Plaintiff's blood pressures were high before defendant provided plaintiff with medical care, and were high under the care of other physicians besides defendant. (Id.)
- Adjustment of blood pressure medications for optimal, safe control is the ordinary

17

course of care for all patients with high blood pressure.  (Id.)

- In Dr. Barnett's opinion, defendant's disinclination to reintroduce clonidine to plaintiff's medication regimen when plaintiff's blood pressure was reasonably controlled off clonidine was "consistent with best practices."  (Id.)

- Clonidine is not recommended as a first, second, or even third line drug for treatment of essential hypertension.  (Id.)  Clonidine is sometimes used as a "last resort."  (Id. at 18.)  The main drawback for treatment with clonidine is the dangerously high blood pressures that occur when just a few doses of this medication are missed.  (Id.)  This rebound is particularly disconcerting in prison populations.  (Id.)

- There are many instances where plaintiff reported not taking his medications for a variety of reasons.  (Id.)  In Dr. Barnett's opinion, "[d]rugs other than clonidine that do not demand such rigorous compliance are preferable."  (Id.)

- All prescription drugs cause side effects.  The best way to avoid side effects is to reduce the total number of medications prescribed.  (Id.)  Clonidine's side effects include dizziness, fatigue, and headache.  (Id.)

Plaintiff's Evidence Regarding High Blood Pressure Claim[11]

In his deposition, plaintiff made the following statements with respect to his blood pressure medication:

- The blood pressure medications plaintiff was taking "on the streets" are the same medications plaintiff was taking at the time of his deposition, on April 9, 2015. (ECF No. 39-6 at 20.)  These medications did not cause plaintiff to experience side effects.  (Id.)

- The medications defendant Nangalama prescribed caused plaintiff to experience

---

[11] Plaintiff Maurice Woodson's opposition was signed under penalty of perjury by "Gerald Wilson."  See ECF No. ECF No. 45 at 24.  Because *plaintiff* did not sign his opposition under penalty of perjury, plaintiff's opposition is not verified.  Accordingly, the court does not consider the allegations contained in plaintiff's opposition as evidence, to the extent they are not duplicated in plaintiff's deposition testimony or verified complaint.

18

side effects.  (Id.)  Plaintiff started noticing the side effects two to three weeks after he started the medications prescribed by defendant, or possibly sooner.  (Id.)  Plaintiff experienced "headaches intense pressure behind the eyes continuously because the blood pressure is continuously always high."  (Id.)  The medications also caused dizziness and stress on plaintiff's kidneys.  (See id. at 21.)

- Defendant took plaintiff off his regular blood pressure medications, tried some other medications for eight months to over a year, and then put plaintiff back on the same medications he had previously been taking.  (ECF No. 39-6 at 21.)

- During this eight to twelve month period, plaintiff submitted to weekly blood tests and his blood pressure was checked "every day throughout the whole period."  (Id.)

- Plaintiff was "telling [defendant] all of the time, refer to the files and you will see everything that you are trying to do, using me as a guinea pig, won't work.  It has already been tried to no avail."  (Id.)

- During the time plaintiff was not on his normal blood pressure medications, his blood pressure was high every day.  (Id. at 23, 31.)  Plaintiff knew his blood pressure medication was not working because he experienced headaches, pressure behind his eyes, and dizziness, "classic signs of when a person's blood pressure is high."  (Id. at 32.)

- Plaintiff's understanding is that his medical records now contain a notation "saying do not take this man off of none of his regimen medication."  (Id. at 26.)

- During the time defendant changed plaintiff's blood pressure medications, plaintiff was sent to an outside hospital three or four times.  The most recent time plaintiff was sent to UC Davis.  According to plaintiff, the doctor at UC Davis recommended that plaintiff be put back on his old medications.  (Id.)

- At the time of his deposition, plaintiff believed his blood pressure was under control.  (Id. at 23.)

////

1      The court also considers plaintiff's medication reconciliation sheets from 2008 and 2009,

2   attached as an exhibit to plaintiff's original complaint.[12]  (ECF No. 1.)  These medication

3   reconciliations indicate that although plaintiff's blood pressure medications did not remain static

4   in 2008 and 2009, plaintiff was generally prescribed amlodipine (5 mg once per day), clonidine

5   (0.3 mg twice per day), enlapril (15 mg twice per day), docusate sodium (100 mg capsule twice

6   per day), with some variations.  (See ECF No. 1 at 6-32.)  Plaintiff was also often treated with

7   aspirin, hydrochlorothiazide, and simvastatin.  (See id.)

8          Facts Related to Chronic Pain Claims

9      Plaintiff's medical file indicates that in early 2006, plaintiff began experiencing elbow

10   pain.  (See ECF No. 39-5 at 10.)  On June 27, 2006, an x-ray was taken of plaintiff's right elbow.

11   (ECF No. 39-5 at 9.)  Plaintiff was prescribed naprosyn 500 mg BID for six weeks.  (Id.; Barnett

12   Declr. at 7.)  Naproxen (brand name naprosyn) is a non-steroidal anti-inflammatory drug

13   (NSAID), in the same category as ibuprofen and aspirin.  (Barnett Declr. at 7.)

14      On October 25, 2006, plaintiff was seen in the orthopedic clinic with a complaint of right

15   elbow pain. The report indicates that surgery was an option, but plaintiff declined.  (Id.)  The

16   report also states, "no known drug allergies."  (Id.)

17      On December 21, 2006, plaintiff was prescribed "ibuprofen 400 mg x 10."  (Id. at 12.)

18   The pills were dispensed by a dentist at CSP-SAC.  (Id.)

19      At some point prior to August 11, 2008, plaintiff was prescribed tramadol hcl 50 mg, two

20   tablets to be taken three times daily for his elbow pain.  (ECF No. 1 at 12.)  It appears that

21   plaintiff's tramadol prescription was regularly renewed throughout 2008 and 2009.  (See id. at 6-

22   32.)

23

24   ───────────────
[12] In the initial screening order, the court advised plaintiff that if he submitted an amended
25   complaint, he would not be required to resubmit his exhibits, but could ask the court to reattach
the exhibits to his amended complaint.  (ECF No. 7 at 7.)  Plaintiff did not specifically request
26   that the court reattach the exhibits to his amended complaint, but did reference these exhibits in
the body of his amended complaint.  (See ECF No. 15 at 5.)  In light of the liberal construction of
27   pro se filings, the undersigned construes these attachments as part of the amended complaint and
therefore part of the record on summary judgment.  Because these exhibits do not ultimately
28   affect the court's analysis, the undersigned finds no prejudice to defendant.

On August 20, 2009, plaintiff had a mass surgically excised from his right elbow.  The progress note states that plaintiff received staples in his right elbow and was "doing well" with no acute issues.  (ECF No. 39-5 at 16.)

On September 22, 2009, plaintiff informed his physician that he did not want Tylenol #3[13] because it causes nausea.  (Id. at 17.)  The physician wrote that plaintiff was "doing well" on tramadol and morphine, and Tylenol #3 would be discontinued per plaintiff's request.  (ECF No. 39-5 at 17.)

On January 10, 2010, plaintiff was seen at an outside medical facility for issues related to his hypertension.  The emergency department physician's notes states, "no known allergies."  (Id. at 18.)

On January 28, 2010, plaintiff's tramadol prescription (prescribed by non-party Dr. Hamkar) was continued through May 19, 2010.  (Id. at 22.)  The medication reconciliation sheet states, "allergies: NSAIDS."  (Id.)

On April 13, 2010, defendant wrote a progress note primarily concerning plaintiff's hypertension and blood pressure medications.  (Id. at 27.)  Under the "allergies" box, "NSAIDS" is handwritten.  (Id.)

On May 20, 2010, plaintiff submitted a healthcare services request form "to renew [his] pain pills tramadol."  (Id. at 33.)  On this form, a nurse noted that plaintiff was "scheduled for MD line 5/26/10."  (Id.)

On May 21, 2010, plaintiff submitted a healthcare services request, stating, "I need to renew my pain medication tramadol."  (Id. at 31.)

On May 24, 2010, defendant Nangalama reviewed plaintiff's medical file and medications, but did not meet with plaintiff.  (Nangalama Declr. at 4.)  Defendant did not renew plaintiff's tramadol prescription, which had expired on May 19, 2010.  (See ECF No. 39-5 at 32.)  Instead, defendant prescribed plaintiff ibuprofen 600 mg #90 (a 30-day supply) three times daily as needed for pain.  (Barnett Declr. at 11.)  The form on which defendant wrote the ibuprofen

---

[13] Tylenol #3 appears to refer to Tylenol with Codeine #3.

1   prescription contains the notation, "allergies: NSAIDS."  Ibuprofen in a NSAID.  (Barnett Declr.

2   at 7.)

3       On May 26, 2010, plaintiff was scheduled for doctor's line and saw Dr. Ali.  (ECF No.

4   39-5 at 34.)  Dr. Ali wrote in his report that he performed an elbow exam on plaintiff but plaintiff

5   "was not very compliant."  (Id.)  Dr. Ali reported that plaintiff requested tramadol, but that "for

6   now" he would give plaintiff tylenol for pain instead of tramadol.  (ECF No. 39-5 at 34).  The

7   report appears to state, "pt. agrees for meds compliance."  (See id.)  Dr. Ali prescribed plaintiff

8   acetaminophen (tylenol) 325 mg, two pills twice daily as needed for pain, but did not discontinue

9   plaintiff's ibuprofen prescription.  (See id. at 35.)  The medication reconciliation form contains

10  the notation, "allergies: NSAIDS."  (Id.)

11      On June 24, 2010, plaintiff saw defendant Nangalama.  (Barnett Declr. at 12.)  Defendant

12  noted that plaintiff's creatinine levels were elevated to 1.53 from a prior lower level of 1.33,

13  indicating renal insufficiency.  (Id.; ECF No. 39-5 at 37.)  Defendant discontinued plaintiff's

14  ibuprofen prescription and ordered tests to check plaintiff's kidney function.[14]  (Id.)  Defendant

15  continued plaintiff's other medications, including acetaminophen.  (ECF No. 39-5 at 38; Barnett

16  Declr. at 12.)

17      On July 28, 2010, plaintiff had a renal artery ultrasound, ordered by defendant

18  Nangalama.  (Barnett Declr. at 12; ECF No. 39-5 at 39-40.)  The report indicates that plaintiff

19  was being evaluated for renal artery stenosis.  (Id. at 39.)  The test results were negative for any

20  disease.[15]  (Barnett Declr. at 12).  The report from UC Davis also states, "no known allergies."

21  (ECF No. 39-5 at 41.)

22      On September 13, 2010, Dr. Duc continued plaintiff's acetaminophen prescription for 90

23  days.  (Id. at 50.)

24  ////

25

26  [14] Defendant's report states in relevant part, "renal insufficiency – D/C – Ibuprofen, repeat labs."
    (ECF No. 39-5 at 37.)

27

28  [15] The report states, "Limited examination due to bowel gas.  Unable to evaluate right renal artery
    for stenosis.  Patent left renal artery without evidence of a focal stenosis."  (ECF No. 39-5 at 40.)

1   On November 18, 2010, defendant Nangalama continued plaintiff's acetaminophen

2   prescription for 90 days.[16]  (Id. at 52.)

3   A note in plaintiff's medical file dated September 21, 2011 summarizes plaintiff's

4   creatinine levels as:  2.0 in February 2010, 1.4 in September 2010, and 1.64 in July 2011.  (Id. at

5   66.)  On December 16, 2011, plaintiff's creatinine level was 1.47.  (Id. at 74.)

6   Meanwhile, on August 12, 2010, plaintiff filed a healthcare appeal alleging that he had

7   previously been prescribed tramadol for chronic pain because ibuprofen and tylenol cause him

8   adverse side effects.  (ECF No. 15 at 19-21.)  Plaintiff alleged that if defendant Nangalama had

9   checked to see if plaintiff was allergic to any medications before changing his prescription,

10   defendant would have been informed that plaintiff "may only take tramadol for his chronic pain."

11   (Id.)  Plaintiff alleged that after defendant discontinued his tramadol prescription, plaintiff's pain

12   became "severe due to no pain medication for [plaintiff] to take."  (Id.)  Plaintiff further alleged

13   that he suffered from excruciating headaches, lack of concentration, and nausea "due to no pain

14   killers in which [plaintiff] may take to alleviate the 'chronic pain' in his elbow(s)."  (Id.)

15   On October 21, 2010, plaintiff appeal log SAC-10-10-12365 was granted in part at the

16   first level of review.  ECF No. 15 at 23.  Dr. Dhillon reviewed plaintiff's medical file and

17   interviewed plaintiff in connection with the appeal.  Dr. Dhillon acknowledged plaintiff's

18   complaints but concluded that tramadol was not in plaintiff's "best interest given [his] kidney

19   function at this time."  (ECF No. 39-7 at 17.)

20   On or about November 4, 2010, plaintiff pursued his grievance to the second level of

21   review.  Plaintiff stated in his appeal that he had been given tramadol for over three years without

22   any problems, and that ibuprofen causes problems with plaintiff's kidneys.  (ECF No. 15 at 22.)

23   Also on November 18, 2010, plaintiff's appeal log SAC-10-10-12365 was partially

24   granted at the second level of review.  ECF No. 39-7 at 14.  Dr. Duc reviewed plaintiff's appeal

25   and medical records and responded as follows:

26   ---

[16] Defendant provides plaintiff's medication reconciliation sheets for the following subsequent
27   dates: February 24, 2011; April 8, 2011; June 13, 2011; August 10, 2011; August 25, 2011;
September 20, 2011.  (ECF No. 39-5 at 55, 57, 58, 61, 64, 65.)  These medication reconciliations
28   do not list acetaminophen as one of plaintiff's active medications.  (See id.)

> You are being worked up to rule out Renal Insufficiency.  At the present time, you are given only Tylenol 650 mg, twice a day only as needed.  This is a safe dosage and regimen for your condition. Tramadol is obviously not indicated at the present time.  Your 602 appeals were granted only partially because your demand of Tramadol cannot be granted.  You are not given Ibuprofen now.

ECF No. 39-7 at 16.

On May 17, 2011, plaintiff's appeal log SAC-10-10-12365 was denied at the third level of review.  (ECF No. 15 at 31-32.)

Defendant Nangalama's Declaration

In support of his summary judgment motion, defendant Nangalama declares as follows:

- Defendant reviewed plaintiff's medical records and medications on May 24, 2010. (Nangalama Declr. at 4.)

- Defendant determined that there was no medical indication plaintiff should continue to receive tramadol.  (Id.)

- In defendant's medical opinion, plaintiff did not need tramadol because his pain was not getting worse.  Plaintiff's pain had stabilized, plaintiff was functioning, and his pain was chronic over a number of years.  (Id.)

- There was a risk for plaintiff to stay on tramadol because it is a highly addictive narcotic that patients should not stay on indefinitely.  Tramadol has dangerous side effects and can be abused.  In defendant's medical judgment, ibuprofen was safer for plaintiff than tramadol.

- Defendant reviewed plaintiff's records before changing his prescription, was aware that plaintiff was in chronic pain, considered the medical options, and determined that the best course of treatment for plaintiff was to remove his prescription for tramadol.  (Id.)

Dr. Barnett's Declaration

Defendant also submitted the declaration of Dr. Barnett, who declares as follows:

- Tramadol is a narcotic-like substance with substantial potential for abuse.  (Id. at 11.)  Tramadol is most commonly abused by narcotic addicts, chronic pain

24

patients, and health professionals.  (Id.)  The use of narcotics (including tramadol) for chronic orthopedic pain is disfavored.  (Barnett Declr. at 8.)

o In Dr. Barnett's opinion, defendant's decision to prescribe an alternate non-controlled drug (ibuprofen) was "reasonable" and "well-considered," given the lack of "overt indications of serious need for tramadol" and the fact that plaintiff was scheduled for an exam by a physician "just two days later" on May 26, 2010. (Id.)

o The prescription written by defendant for ibuprofen on a form that reported a NSAIDs allergy "does not comport with best practices as ibuprofen is a NSAID." (Id. at 11.)  In Dr. Barnett's opinion, defendant's writing a prescription for ibuprofen while not challenging the listing of a NSAIDs allergy "appears to have been an oversight."  (Id.)

o Plaintiff's prison medical records list NSAIDs as an allergy for plaintiff.  "This is certainly not the case as plaintiff took [aspirin] for years with impunity, and has also taken ibuprofen and Naprosyn without an allergic reaction.  It is more accurate to described plaintiff as 'intolerant' to NSAIDs as these substances appear to impair his renal function."  Renal impairment from NSAIDs is a well-known side effect that should be balanced against the benefit of this class of drugs. (Barnett Declr. at 7.)

o A great many drugs impair renal function as measured by blood tests, including medications which plaintiff has continued to take over the years.  Acetaminophen, aspirin, and enalapril are especially well known to cause serum elevations of creatinine and chronic renal failure.  With so many drugs having deleterious effects on the kidney, physicians frequently cannot avoid the prescription of drugs that have adverse effects.  (Id. at 20.)

o High doses of ibuprofen may cause kidney dysfunction, which usually returns to the pre-treatment status after discontinuation of ibuprofen.  (Id. at 19.)

o Subsequent kidney function tests showed no injury to plaintiff's kidneys by the

25

1   prescription of ibuprofen from May to June 2010.  (Id. at 20.)

2        o   In Dr. Barnett's opinion, plaintiff did not suffer harm from defendant's

3           prescription of ibuprofen.  In February 2010, plaintiff's creatinine was 2.0.

4           Although plaintiff's creatinine level was "slightly elevated at 1.53" in June 2010

5           after he had been provided with ibuprofen at the end of May, plaintiff's creatinine

6           was stable at 1.47 on December 16, 2011.  (Id. at 20.)

7        o   Plaintiff's claim that he suffered severe pain for two years following

8           discontinuation of tramadol "is belied by the extensive documentation of his

9           satisfaction with non-tramadol medications, including Tylenol as early as a few

10          days after discontinuation of tramadol and continuing thereafter."  (Id. at 11.)

11       o   There are no notes in plaintiff's prison medical records after May 2010 in which

12          plaintiff complains of elbow pain.  (Id. at 11.)

13      Plaintiff's Evidence Regarding Pain Claim

14         In his verified complaint, plaintiff alleges that after defendant discontinued his tramadol

15  prescription, plaintiff's "severe pain" returned.  (ECF No. 15 at 7.)  Plaintiff's pain has constantly

16  been an eight on a scale of one to ten since tramadol was discontinued.  (Id. at 8.)  Plaintiff

17  alleges that defendant did not prescribe any medication to properly manage plaintiff's chronic

18  pain, and the medication defendant did prescribe did not "properly deal" with plaintiff's chronic

19  pain.  (Id.)  Specifically, the prescription for tylenol 650 mg twice per day did not address

20  plaintiff's pain management issues.  (Id. at 9.)

21         The undersigned also find the following statements relevant from plaintiff's April 9, 2015

22  deposition:

23           •   With respect to pain medication, tramadol was "working" for plaintiff.  (Plaintiff's

24             Deposition at 16.)

25           •   Defendant Nangalama took plaintiff off of tramadol and prescribed "the pain

26             medication that is the reason for why we are in here now."[17]  (Id.)

27

28

---

[17] At his deposition, plaintiff indicated he could not remember the name of the pain medication
defendant prescribed that caused him adverse side effects because he did not have his medical

- Plaintiff was not initially aware that defendant had prescribed him a NSAID. (ECF No. 39-6 at 18.)  Plaintiff found out that he had been prescribed a NSAID because he started noticing that when he wiped himself, he saw traces of blood in his urine. (Id.)  Plaintiff asked a nurse if his medication was part of the NSAID family and she said yes.  (Id.)  At that point, plaintiff stopped taking the medication.  (Id.)  Plaintiff then put in a medical slip to see a doctor.  (See id.)  Plaintiff did not see a doctor until three weeks to a month and a half later.  (Id. at 17.)

- Plaintiff assumed the traces of blood in his urine were from his pain medication because he had been on other pain medication for over a year and had just started the new medication when he started seeing the traces of blood in his urine.  (Id. at 29.)  When he stopped taking the new medication, he stopped seeing traces of blood in his urine.  (Id.)

- Plaintiff discussed his elbow pain with defendant.  (Id. at 25.)  At some point, defendant told plaintiff that he did not need pain medication.  (Id. at 29.)

- At the time of his deposition, plaintiff was not taking any pain medications because prison medical staff "won't give them to [him]."  (Id. at 12.)

VIII.   Discussion

It is undisputed that, at all times relevant to this action, plaintiff's hypertension (high blood pressure), chronic kidney disease, and chronic elbow pain were "serious medical needs" within the meaning of the Eighth Amendment.  See McGuckin, 974 F.2d at 1059-60.  At issue is whether defendant was deliberately indifferent to plaintiff's serious medical needs when he changed plaintiff's blood pressure and pain medications in 2010 and 2011.

For the reasons discussed below, the undersigned finds that summary judgment should be granted with respect to plaintiff's challenge to his blood pressure medications and his ibuprofen prescription, but denied as to plaintiff's claim that defendant failed to prescribe medication that adequately managed plaintiff's chronic pain.

---

files with him.  (ECF No. 39-6 at 16.)  However, the parties appear to agree that plaintiff was referring to ibuprofen.

*Blood Pressure Medication Claim*

In his first claim, plaintiff contends that defendant Dr. Nangalama was deliberately indifferent to his serious medical needs when he left plaintiff on an ineffective regimen of blood pressure medications for eight to twelve months.  Plaintiff alleges that defendant refused to renew the medications that "worked" for him, causing plaintiff to experience elevated blood pressure, headaches, dizziness, and pain behind his eyes.  In particular, plaintiff challenges defendant's alleged refusal to prescribe clonidine, which plaintiff describes as the "primary" medication that keeps his blood pressure down "so [he] will not die."  (See ECF No. 45 at 12.)

At the outset, the court observes that to the extent plaintiff claims he should have been prescribed a specific combination of blood pressure medications, plaintiff does not make clear which medications he should have been prescribed, and the record contains no evidence suggesting that plaintiff's blood pressure could only be controlled through one specific combination of medications.[18]  Accordingly, the court focuses on plaintiff's claim that defendant acted with deliberate indifference by refusing to treat him with clonidine, which rendered his other medications ineffective.[19]

Plaintiff alleges that he was denied clonidine for approximately eight to twelve months, but does not specify when this period began or ended.  The court's review of the record indicates that in 2008 and 2009, plaintiff was regularly prescribed clonidine 0.3 mg to be taken twice daily, in addition to other blood pressure medications.  On January 9, 2010, plaintiff's clonidine prescription was stopped by a physician at CSP-SAC (possibly Dr. Sahota).  On January 10, 2010, plaintiff was sent to an outside hospital for treatment, but the treating physician prescribed

---

[18] A grievance attached to plaintiff's original complaint suggests that the medications plaintiff may have initially desired were "aspir-low 81 mg, clonidine HCL 0.3 mg, docusate sodium 100 mg, enalapril malete 20 mg, and hydrocholorothiazine 25 mg."  (See ECF No. 1 at 37.)  However, when plaintiff told Dr. Dhillon on December 16, 2011, that he was satisfied with his blood pressure medications and did not require any adjustments, he was taking a different combination of medications.  (See ECF No. 39-5 at 74.)

[19] Although plaintiff did not mention clonidine in his amended complaint, plaintiff's sole argument on summary judgment is that his hypertension should have been treated with clonidine. (See ECF No. 45 at 8, 9, 12.)

28

alternate medications in "an attempt to respect [the] prison physician's effort to stop clonidine." It appears that plaintiff did not receive clonidine again until September 13, 2010, approximately eight months later, when Dr. Duc prescribed clonidine 0.2 mg for 90 days.  Plaintiff's clonidine prescription was thereafter renewed, but was stopped sometime between late February and early April 2011.  Plaintiff remained off clonidine until August 2011, when Dr. Dhillon prescribed plaintiff clonidine 0.1 mg, half tab to be taken twice daily.  Plaintiff remained on clonidine and his dose was increased by defendant in August and again in September 2011.  As of December 2011, plaintiff was taking clonidine 0.2 mg twice daily and was satisfied with his medications. Accordingly, it appears that plaintiff was without clonidine for approximately eight months in 2010 and approximately four to five months in 2011.

Defendant's evidence on summary judgment establishes that throughout 2010 and 2011, defendant monitored plaintiff's blood pressure and adjusted his blood pressure medications on a fairly regular basis, which both defendant and Dr. Barnett declare is within the ordinary course of care for treatment of hypertension.  Defendant selected medications that he felt were in plaintiff's best interest, based on his training and experience, and defendant's treatment decisions are supported by Dr. Barnett's expert opinion that the medications defendant renewed and prescribed were effective.  Furthermore, defendant's reluctance or refusal[20] to treat plaintiff with clonidine "when plaintiff's blood pressure was reasonably controlled off clonidine" is supported by Dr. Barnett's opinion that defendant's decision was "consistent with best practices."  As Dr. Barnett explains, there is a "rebound effect" associated with clonidine in that dangerously high blood pressures can occur when just a few doses of clonidine are missed.  Plaintiff's medical records indicate that plaintiff either missed or was noncompliant with his blood pressure medications in January 2010, April 2010, May 2010, and July 2010.  When plaintiff was sent to an outside hospital on January 10, 2010, for a hypertensive episode where his blood pressure reached "the 180s," the emergency department physician specifically noted that plaintiff's episode was the

---

[20] By using the term "refusal," the court does not mean to suggest that defendant never treated plaintiff with clonidine.  The record reflects that when plaintiff was prescribed clonidine by other physicians, defendant renewed the prescriptions on several occasions.

1   result of plaintiff not taking his regular medications, which had run out in prison one week earlier.

2   Given the "many instances where plaintiff reported not taking his medications for a variety of

3   reasons," Dr. Barnett opined that drugs other than clonidine were "preferable," which suggests

4   that defendant's reluctance to treat plaintiff with clonidine was reasonable and supports

5   defendant's claim that the treatment he provided was medically acceptable.

6        Plaintiff argues that defendant should have treated him with clonidine because plaintiff

7   had been taking clonidine for "twenty years with no problems" until defendant stopped his

8   clonidine prescription.  (ECF No. 45 at 21.)  As discussed above, plaintiff's assertion that he had

9   "no problems" with clonidine is contradicted by his medical records, which indicate that his

10  January 10, 2010 episode was the result of missed blood pressure medications, including

11  clonidine.  Moreover, even if plaintiff had not previously had problems with clonidine,

12  defendant's decision to treat plaintiff with alternate blood pressure medications constitutes a

13  difference of opinion between medical professionals regarding the proper course of treatment,

14  which does not, without more, amount to deliberate indifference.  See Snow, 681 F.3d at 987.

15  While plaintiff emphasizes that he was later prescribed clonidine by another physician (or that

16  defendant was told by another physician to prescribe clonidine), this fact again is a difference of

17  opinion regarding treatment options and does not suggest that defendant acted with deliberate

18  indifference by prescribing blood pressure medications that did not include clonidine.

19       Plaintiff also contends that defendant was deliberately indifferent because the medications

20  defendant prescribed were ineffective, and plaintiff's blood pressure was elevated "every day"

21  without clonidine.[21]  (See ECF No. 39-6 at 23, 31.)  To the extent plaintiff alleges that his blood

22  pressure was always elevated without clonidine, plaintiff's claim is contradicted by his medical

23  records, which indicate that plaintiff's blood pressure was "well controlled" in February 2010 and

24  April 2011, and "very well controlled" in June 2011 when he was not taking clonidine.  While the

---

[21] Plaintiff's belief that his blood pressure was elevated appears to be based on his allegation that
25  he experienced headaches and pain behind his eyes, which plaintiff contends are "classic signs"
26  of elevated blood pressure.  (See ECF No. 39-6 at 21.)  While the court accepts as true plaintiff's
27  allegation that he experienced headaches and pain behind his eyes, plaintiff is not a medical
    expert and is not qualified to offer an opinion as to whether these symptoms are indicative of
28  elevated blood pressure.

1   record provides some support for plaintiff's claim that his blood pressure was often poorly

2   controlled during the time he was not taking clonidine in 2010, this correlation does not suggest

3   that the medications prescribed by defendant were ineffective, as the record also indicates that

4   plaintiff was noncompliant with his medications in April, May, and July 2010.  Moreover, even if

5   plaintiff could show that defendant was negligent in prescribing ineffective medications,

6   negligence or malpractice alone does not violate the Eighth Amendment.  See Estelle, 429 U.S. at

7   105–06; Toguchi, 391 F.3d at 1059.

8        There is no indication from the record before the court that defendant consciously

9   disregarded an excessive risk to plaintiff's health when he monitored plaintiff's blood pressure,

10   selected medications he believed were in plaintiff's best interest, and ordered further testing to

11   investigate plaintiff's poorly controlled hypertension but did not prescribe clonidine.  In light of

12   the risk clonidine poses to patients who miss doses of medication, and defendant's apparent belief

13   that plaintiff did not always take his blood pressure medications, see ECF No. 39-5 at 70

14   ("[Plaintiff] states that he takes his medications regularly, but I think [plaintiff] is noncompliant

15   with his medications, and I think he does not take his medications on some occasions."), a trier of

16   fact could not reasonably conclude that defendant had the requisite state of mind to support a

17   claim of deliberate indifference.[22]  Because plaintiff's claim appears to be no more than a

18   disagreement regarding the proper course of medical treatment, and plaintiff has come forward

19   with no competent evidence suggesting that defendant's actions were medically unacceptable

20   under the circumstances, defendant should be granted summary judgment on this claim.

21        *Chronic Pain Claims*

22        The undersigned finds that plaintiff raises two claims regarding the alleged denial of

23   adequate pain medication.  Plaintiff first challenges defendant's May 24, 2010 decision to

24   substitute ibuprofen, to which plaintiff claims he is allergic, for tramadol.  Plaintiff also

25   _____

26   [22] Plaintiff stated in his deposition that he told defendant to "refer to the files" and he would see
     that everything defendant was trying to do had been tried before "to no avail."  (ECF No. 39-6 at
27   21.)  To the extent plaintiff means to assert that his medical records at the time contained
     evidence that other physicians had tried unsuccessfully to remove clonidine from plaintiff's
28   medication regimen, the record before the court does not support plaintiff's claim.

1  challenges defendant's decision to prescribe acetaminophen in lieu of tramadol for treatment of

2  plaintiff's chronic pain.

3       1.  Ibuprofen Prescription

4       The court first addresses plaintiff's claim that defendant was deliberately indifferent to his

5  serious medical needs when he discontinued plaintiff's tramadol prescription and instead

6  prescribed him ibuprofen.  Plaintiff alleges that he is allergic to ibuprofen and that it caused him

7  adverse side effects.  Plaintiff contends that defendant knew he was allergic to ibuprofen and

8  prescribed it anyway, knowing that it would adversely affect plaintiff.  Plaintiff appears to allege

9  that he was at risk of having a life-threatening allergic reaction as a result of taking ibuprofen

10 because it is a NSAID and he is allergic to NSAIDs.

11      It is undisputed that plaintiff's prison medical records list NSAIDs as an allergy for

12 plaintiff.  On summary judgment, plaintiff argues that defendant must have known about his

13 NSAID allergy because the allergy is listed on the cover of plaintiff's medical file,[23] and

14 defendant stated that he reviewed plaintiff's medical file before changing plaintiff's medication

15 on May 24, 2010.  Because plaintiff has not provided the court with a copy of his medical file, the

16 court cannot confirm that plaintiff's NSAID allergy is listed on the front cover.  However, it is

17 undisputed that plaintiff's NSAID allergy is listed repeatedly throughout plaintiff's prison

18 medical records, and even the form on which defendant wrote the ibuprofen prescription lists a

19 NSAID allergy.  Drawing all inferences in plaintiff's favor, it is reasonable to infer from

20 defendant's statement that he reviewed plaintiff's medical file, and the frequency with which

21 plaintiff's NSAID allergy is listed in plaintiff's medical records, that defendant was aware of the

22 NSAID allergy notation when he prescribed plaintiff ibuprofen on May 24, 2010.  Defendant

23 ─────────────────────

24 [23] Defendant does not specifically address whether he was aware of the NSAID allergy notation
   in plaintiff's medical file when he prescribed plaintiff ibuprofen, a NSAID.  Plaintiff initially
25 alleged in his complaint that defendant prescribed plaintiff ibuprofen because defendant did not
   review plaintiff's medical file before discontinuing his tramadol prescription, and that had
26 defendant met with plaintiff, plaintiff would have informed defendant of his NSAID allergy.  To
   the extent plaintiff continues to argue that defendant prescribed ibuprofen because he was
27 unaware of plaintiff's NSAID allergy, plaintiff's claim fails because negligence and even
   malpractice alone do not violate the Eighth Amendment.  See Estelle, 429 U.S. at 105-106;
28 Toguchi, 391 F.3d at 1059.  However, plaintiff appears to have abandoned this argument.

1    does not contend otherwise.

2         But even assuming defendant knew plaintiff's medical file listed a NSAID allergy, this

3    fact does not indicate that defendant acted with deliberate indifference because plaintiff has not

4    shown that he is actually allergic to NSAIDs or ibuprofen.  Plaintiff repeatedly argues that he

5    cannot take ibuprofen because he is allergic to NSAIDs.  Plaintiff's argument is understandable

6    given that his medical file lists a NSAID allergy and ibuprofen is a NSAID.  Even defendant's

7    own expert admits that defendant's act of writing an ibuprofen prescription on a form that

8    documented a NSAID allergy did not comport with best practices.  However, the record contains

9    evidence that despite the notation in his medical file, plaintiff is not allergic to NSAIDs.

10   Significantly, plaintiff's medical records establish that for years plaintiff has taken aspirin, a

11   NSAID, on a daily basis without problems.[24]  Plaintiff has also been prescribed naproxen, another

12   NSAID, and ibuprofen in the past, apparently without an allergic reaction.  While plaintiff alleges

13   that he suffered adverse consequences from taking ibuprofen in 2010, plaintiff has come forward

14   with no evidence suggesting that he had an allergic reaction.[25]  As Dr. Barnett explains in his

15   expert declaration, plaintiff is not so much allergic to NSAIDs as he is relatively intolerant to

16   them in that they impair his renal function.  This mere intolerance may explain why, as of May

17   2010, plaintiff's medical records from outside medical facilities indicate that plaintiff has "no

18   known allergies."

19        In light of Dr. Barnett's expert opinion that plaintiff is not allergic to ibuprofen, and

20   plaintiff's apparent ability to tolerate ibuprofen and several other NSAIDs without allergic

21   reaction, the evidence in the record appears to establish that plaintiff has a sensitivity to

22   ibuprofen, but not an actual allergy.  Accordingly, to the extent plaintiff alleges defendant

23   prescribed him a medication he is allergic to, which had the potential to cause a life-threatening

24   _____

25   [24] It appears that aspirin was prescribed to treat plaintiff's hypertension.

26   [25] Plaintiff alleges that when he did not take pain killers, he experienced excruciating headaches,
     lack of concentration, and nausea.  However, in terms of side effects or reactions caused by
27   ibuprofen, plaintiff's allegations appear to be limited to his statement that he saw traces of blood
     in his urine when he started taking ibuprofen.  The record contains no evidence that blood in the
28   urine is evidence of an allergic reaction to ibuprofen (as opposed to an intolerance to ibuprofen).

1    allergic reaction, plaintiff's claim is unsupported by the record.

2        The undersigned further finds that as of May 24, 2010, when defendant reviewed

3    plaintiff's medical file, plaintiff's medical records did not contain a clear indication that he is

4    sensitive to ibuprofen.[26]  Therefore, even assuming that a sensitivity to ibuprofen meets the

5    objective component of the Eighth Amendment, there is no evidence of the subjective component,

6    i.e. that defendant disregarded a serious medical need.  Accordingly, defendant should be granted

7    summary judgment to the extent plaintiff's claim is based on his assertion that defendant

8    prescribed ibuprofen knowing that plaintiff had a sensitivity to ibuprofen.

9        The court next considers whether defendant acted with deliberate indifference by

10   prescribing ibuprofen to plaintiff, given plaintiff's known history of renal insufficiency.  Dr.

11   Barnett states in his declaration that one of the known side effects of NSAIDs is renal

12   impairment.  According to Dr. Barnett, this side effect should be balanced against the benefit of

13   the NSAID class of drugs.  Dr. Barnett explains that high doses of ibuprofen may cause kidney

14   dysfunction, which usually returns to the pre-treatment status after discontinuation of ibuprofen.

15   According to Dr. Barnett, because so many drugs have deleterious effects on the kidney,

16   physicians frequently cannot avoid the prescription of drugs that have adverse effects.

17       It is undisputed that at the time defendant prescribed plaintiff ibuprofen on May 24, 2010,

18   defendant was aware that plaintiff suffered from chronic renal impairment.  Based on Dr.

19   Barnett's assertion that renal impairment is a "well-known" side effect of NSAIDs, it is

20   reasonable to infer that defendant was aware that ibuprofen could have an adverse effect on

21   plaintiff's kidney function.  Accordingly, it appears defendant was aware that prescribing

22   ibuprofen posed some risk to plaintiff's health, given plaintiff's history of chronic renal

23   impairment and the side effects associated with NSAIDs.  However, in light of Dr. Barnett's

24   statement that kidney dysfunction caused by high doses of ibuprofen usually returns to pre-

25

26   [26] While Dr. Barnett states in his declaration that the "designation of NSAIDs as a drug allergy on
     plaintiff's chart relates to plaintiff's apparent sensitivity and intolerance to ibuprofen," there is no

27   indication that this would have been clear to defendant when he reviewed the file on May 24,
     2010.  Dr. Barnett's use of the word "apparent" appears to refer to the ibuprofen sensitivity that

28   became apparent *after* defendant prescribed plaintiff ibuprofen on May 24, 2010.

1   treatment levels when the medication is discontinued, it appears that the risk posed was not

2   substantial.  See Farmer, 511 U.S. at 947 (deliberate indifference requires that the prison official

3   knows of "a substantial risk of serious harm and disregards that risk by failing to take reasonable

4   measures to abate it").

5          Even assuming that the risk posed was substantial, the record does not contain evidence

6   that defendant consciously disregarded that risk.  The record establishes that on May 24, 2010,

7   defendant prescribed plaintiff a thirty-day supply of ibuprofen.  Plaintiff started taking the

8   medication, not realizing that it was a NSAID.  At some point, plaintiff started seeing traces of

9   blood in his urine.  Plaintiff found out from a nurse that the medication was a NSAID, and

10  stopped taking it.  When he stopped taking the medication, he stopped seeing traces of blood in

11  his urine.[27]  Plaintiff saw defendant on June 24, 2010, and defendant checked plaintiff's creatinine

12  levels to assess his kidney function.  It is undisputed that plaintiff's creatinine level was slightly

13  elevated at 1.53 from a prior lower level of 1.33.  Defendant appears to concede that plaintiff's

14  creatinine level was elevated because of the ibuprofen prescription.  On the same date, and

15  apparently in response to plaintiff's elevated creatinine levels, defendant discontinued plaintiff's

16  ibuprofen prescription and ordered a renal panel to test plaintiff's kidney function.  The renal

17  ultrasound ordered by defendant was performed approximately one month later, on July 28, 2010.

18  Dr. Barnett explains in his declaration that the test results showed no signs of damage to

19  plaintiff's kidneys.  Furthermore, plaintiff's creatinine level was recorded as 1.4 in September

20  2010 and 1.47 in December 2011, which suggests that any effect the ibuprofen had on plaintiff's

21  kidney function was not permanent.  In Dr. Barnett's opinion, plaintiff suffered no harm as a

22  result of being prescribed ibuprofen on May 24, 2010.

23  ////

24

25  [27] Plaintiff stated in his deposition that he could not remember how many days or weeks had
    passed when he stopped taking the medication.  (ECF No. 39-6 at 17-18.)  Plaintiff also stated

26  that when he stopped taking the medication, he put in a service slip to see the doctor, whom he
    did not see for at least three weeks.  (Id.)  Plaintiff's medical records establish that plaintiff saw

27  defendant on June 24, 2010, see ECF No. 39-5 at 37, which suggests that plaintiff stopped taking
    the medication three weeks earlier.  Accordingly, based on plaintiff's own account of the facts, it

28  appears that plaintiff took ibuprofen for approximately one week.

The above evidence establishes that as a result of defendant prescribing plaintiff ibuprofen, plaintiff's kidney function was temporarily impaired.  Defendant responded reasonably by promptly discontinuing plaintiff's ibuprofen prescription and ordering tests to check plaintiff's kidney function, which showed no resulting damage.  Plaintiff's medical records demonstrate that defendant thereafter continued to monitor plaintiff's kidney function throughout 2010 and 2011.  On this record, a trier of fact could not reasonably conclude that defendant consciously disregarded an excessive risk to plaintiff's health and safety when he prescribed plaintiff a thirty-day supply of ibuprofen, monitored his renal function for signs of impairment, discontinued the ibuprofen when tests showed signs of renal impairment, and continued monitoring plaintiff's renal function thereafter.  Accordingly, defendant is entitled to summary judgment on this claim.

   *2.*  Pain Management Claim

   In his final claim, plaintiff contends that defendant was deliberately indifferent to his chronic pain when he discontinued plaintiff's tramadol prescription and thereafter failed to prescribe medication that adequately managed plaintiff's pain.

   It is undisputed that plaintiff suffers from chronic elbow pain and that beginning in 2008, plaintiff was prescribed tramadol, a narcotic, for pain.  Plaintiff's tramadol prescription was renewed throughout 2009 by doctors at CSP-SAC.  Following plaintiff's elbow surgery in August 2009, plaintiff was prescribed both morphine and tramadol for pain.  On January 28, 2010, plaintiff's tramadol prescription was renewed through May 19, 2010.  On May 24, 2010, defendant Nangalama discontinued plaintiff's tramadol prescription and substituted ibuprofen for plaintiff's pain.  On May 26, 2010, Dr. Ali prescribed plaintiff acetaminophen in lieu of tramadol.  On June 24, 2010, defendant discontinued plaintiff's ibuprofen, as discussed above, and continued plaintiff's acetaminophen prescription.  Plaintiff's medical records indicate that his acetaminophen prescription was renewed through December 2010.  At the time of plaintiff's deposition in April 2015, plaintiff was not taking any pain medication because prison medical staff would not give him any pain medication.[28]  According to plaintiff, since defendant

---

[28] Plaintiff appears to allege that prison medical staff stopped giving him pain medication for his elbow pain because they could not find a medication that both managed his pain and was not a

1   discontinued tramadol, plaintiff's pain has consistently been an eight on a scale of one to ten

2   since.  For the purposes of this motion, the undersigned accepts plaintiff's stated pain levels as

3   true.

4       Defendant asserts that he did not renew plaintiff's tramadol prescription on May 24, 2010,

5   because he determined that there was no medical indication that plaintiff should continue to

6   receive tramadol.  (ECF No. 39-7 at 4.)  Defendant declares that he reviewed plaintiff's medical

7   file before changing the prescription and was aware that plaintiff was in chronic pain.  However,

8   in defendant's medical opinion, plaintiff did not need tramadol because his pain was not getting

9   worse.  Defendant declares that plaintiff's pain had stabilized, plaintiff was functioning, and his

10  pain was chronic over a number of years.  Defendant explains that "there was a risk for plaintiff

11  to stay on tramadol because tramadol is a highly addictive narcotic that patients should not stay

12  on indefinitely."  (Id.)

13      Plaintiff contends that defendant could not have been aware of how much pain plaintiff

14  was in as of May 24, 2010, because defendant did not meet with plaintiff before changing

15  plaintiff's prescription.  Considering the record before the court, plaintiff's point is well taken.

16  Defendant asserts that his assessment of plaintiff's pain was based on his review of plaintiff's

17  medical records.  Presumably, defendant is referring to the medical records attached as Exhibit B

18  to defendant's summary judgment motion.  The court has reviewed these records and has been

19  unable to locate any notations in plaintiff's file regarding the status of plaintiff's elbow pain as of

20  May 24, 2010.  Accordingly, it is not clear what documents defendant relied on in determining

21  that plaintiff's pain had stabilized and was not getting worse.  However, in light of plaintiff's

22  assertion that tramadol was "working" for him, and because plaintiff does not contend that his

23  pain was getting worse as of May 24 2010, the undersigned finds it undisputed that at the time

24  defendant discontinued tramadol, plaintiff's pain had indeed stabilized and was not getting worse.

25      Dr. Barnett declared that in his medical opinion, defendant's decision to discontinue

26  tramadol appeared reasonable because there were no overt indications of a serious need for

27

28  NSAID.  (See ECF No. 39-6 at 13.)

1   tramadol.  However, neither defendant nor Dr. Barnett explain what factors would have indicated

2   a serious need for tramadol.[29]  Regardless, even assuming that defendant was not deliberately

3   indifferent to plaintiff's pain when he initially discontinued plaintiff's tramadol prescription,

4   defendant must address plaintiff's allegations that plaintiff's "severe pain" returned and was not

5   adequately managed by acetaminophen.

6        Defendant asserts that plaintiff's claim "that his pain was not adequately managed without

7   tramadol is belied by the extensive medical records documenting his satisfaction with other

8   medications, including acetaminophen."  (ECF No. 39-1 at 8.)  In support of this assertion,

9   defendant cites generally to plaintiff's medical record (Exhibit 1, Attachment B), as well as to Dr.

10  Barnett's declaration.  In his declaration, Dr. Barnett represents that plaintiff's satisfaction with

11  acetaminophen is documented "as early as two days after discontinuation of tramadol."  (ECF No.

12  39-3 at 11.)  Dr. Barnett appears to be referring to a note in plaintiff's medical file written by Dr.

13  Ali on May 26, 2010.  (ECF No. 39-5 at 34.)  Dr. Ali's note states, "for now will give Tylenol for

14  pain, [not] Tramadol." The following line appears to state, "pt. agrees for meds compliance."

15  (See id.)  Defendant and Dr. Barnett interpret this notation as evidence that plaintiff agreed with

16  Dr. Ali's decision to prescribe acetaminophen instead of tramadol.  In the court's view, it is not

17  entirely clear that the "patient agrees" notation refers to the acetaminophen prescription, given

18  that the progress note also contains references to plaintiff's noncompliance with his blood

19  pressure medications.  Regardless, even if plaintiff initially agreed to be temporarily treated with

20  acetaminophen, this fact does not establish that plaintiff remained satisfied with acetaminophen or

21  that acetaminophen adequately managed plaintiff's pain, particularly in light of plaintiff's

22  assertion that his "severe pain" returned after tramadol was discontinued.  While defendant

23  asserts that plaintiff's medical file documents his satisfaction with acetaminophen,[30] the records

24  _____

25  [29] While defendant explains the factors that he relied on, i.e. plaintiff's pain was not getting worse
    and was chronic over a number of years, there is no evidence in the record establishing that those

26  are the factors that are ordinarily considered when making pain management decisions.

27  [30] To the extent defendant means to assert that plaintiff could tolerate acetaminophen, defendant
    is correct that plaintiff's medical records contain no evidence suggesting that plaintiff was unable

28  to tolerate acetaminophen.  While it appears that Tylenol #3 with Codeine caused plaintiff nausea,

1  provided by defendant reveal only that plaintiff was prescribed acetaminophen and the

2  prescription was continued through December 2010.  While defendant may intend for the court to

3  infer from the fact that the prescription was continued that plaintiff's pain was adequately

4  managed, defendant is not entitled to this inference on summary judgment.  Aside from the

5  relatively ambiguous statement in Dr. Ali's May 26, 2010 report, the undersigned finds no

6  evidence in plaintiff's medical file indicating that acetaminophen adequately managed plaintiff's

7  chronic pain.

8        Defendant further argues that the lack of documented complaints of elbow pain in

9  plaintiff's medical file demonstrates that plaintiff's pain was adequately managed by

10  acetaminophen. The court agrees with defendant's assessment that the record before the court

11  contains no documented complaints of elbow pain after May 26, 2010.  However, plaintiff stated

12  in his deposition that he discussed his elbow pain with defendant.  Construing the facts in

13  plaintiff's favor, it is reasonable to infer from plaintiff's allegation that he discussed his elbow

14  pain with defendant, and the lack of documented complaints in plaintiff's medical file, that

15  defendant did not document every conversation he had with plaintiff regarding his elbow pain.

16  Accordingly, the absence of documented complaints in plaintiff's medical file does not establish

17  that plaintiff did not complain of elbow pain or that plaintiff's pain was adequately managed.

18        The undersigned further observes that acetaminophen (tylenol) is not a narcotic and is

19  generally used for the treatment of mild to moderate pain.  See

20  https://www.nlm.nih.gov/medlineplus/druginfo/meds/a681004.html.  Tramadol is used for the

21  treatment of moderate to moderately severe pain.  See

22  https://www.nlm.nih.gov/medlineplus/druginfo/meds/a695011.html.  The fact that plaintiff had

23  previously been prescribed tramadol by other physicians at CSP-SAC indicates that plaintiff

24  suffered from more than mild to moderate pain.  Moreover, plaintiff alleged that after tramadol

25  was discontinued, his "severe pain" returned.[31]  In light of plaintiff's allegations that his severe

26
there is no indication that acetaminophen had the same effect.  However, plaintiff's tolerance of
27  acetaminophen does not suggest that it effectively managed plaintiff's pain.
[31] Although plaintiff is not an expert, plaintiff has personal knowledge of his pain and can testify
28  as to the levels of pain he experienced.

1   pain returned and remained at "an eight" after tramadol was discontinued, there appears to be a

2   dispute of fact as to whether plaintiff's pain was adequately managed by acetaminophen.

3   Furthermore, based on plaintiff's allegation that he discussed his pain with defendant, a trier of

4   fact could reasonably conclude that defendant was deliberately indifferent to plaintiff's pain when

5   he prescribed a drug used for treatment of mild to moderate pain despite plaintiff's assertion that

6   his pain was severe.

7       The court is concerned by the overall lack of information in plaintiff's medical file

8   concerning plaintiff's chronic pain during the time defendant treated plaintiff in 2010 and 2011.

9   Defendant essentially asks the court to conclude, based on an absence of information in plaintiff's

10  medical file, that plaintiff's pain had stabilized and was adequately managed by acetaminophen.

11  Yet plaintiff claims his pain became severe after tramadol was discontinued, remained severe, and

12  was not adequately managed by acetaminophen.  On summary judgment, defendant does not meet

13  his burden by asserting that acetaminophen must have managed plaintiff's pain because the notes

14  in plaintiff's medical file, many of which were written by defendant, do not reference complaints

15  of elbow pain.  On this record, the undersigned cannot conclude as a matter of law that defendant

16  was not deliberately indifferent to plaintiff's need for stronger pain medication.  Taken in the

17  light most favorable to plaintiff, these facts could demonstrate that defendant violated plaintiff's

18  right to adequate medical care by failing to prescribe tramadol or an equivalent strength pain

19  medication.[32]  Accordingly, defendant is not entitled to summary judgment on this claim.

20      IX.    Qualified Immunity

21      Defendant argues that he is entitled to qualified immunity because he did not violate

22  plaintiff's constitutional rights.

23      In analyzing a claim of qualified immunity, a court must examine (1) whether the facts as

24  alleged, taken in the light most favorable to plaintiff, show that the defendant's conduct violated a

25  constitutional right, and (2) if a constitutional right was violated, whether, "in light of the specific

26  _____

27  [32] To the extent plaintiff alleges that tramadol is the *only* medication he can take for his chronic
    pain, this allegation is not supported by the record.  While there is evidence that plaintiff could
    not tolerate Tylenol #3 with Codeine because it caused nausea, this without more does not

28  suggest that tramadol was the only medication that could manage plaintiff's pain.

1  context of the case," the constitutional right was so clearly established that a reasonable official

2  would understand that what he or she was doing violated that right.  See Saucier v. Katz, 533 U.S.

3  194, 201–02 (2001).  If no constitutional right was violated, the inquiry ends and the defendant

4  prevails.  Saucier, 533 U.S. at 201.

5       To meet the "clearly established" requirement, "[t]he contours of the right must be

6  sufficiently clear that a reasonable official would understand that what he is doing violates that

7  right."  Anderson v. Creighton, 483 U.S. 635, 640 (1987).  This requires defining the right

8  allegedly violated in a "particularized" sense that is "relevant" to the actual facts alleged.  Id.

9  "Because the focus is on whether the officer had fair notice that her conduct was unlawful,

10  reasonableness is judged against the backdrop of the law at the time of the conduct."  Brosseau v.

11  Haugen, 543 U.S. 194, 198 (2004).

12       Courts are not required to address the two inquiries in any particular order.  Rather, courts

13  may "exercise their sound discretion in deciding which of the two prongs of the qualified

14  immunity analysis should be addressed first in light of the circumstances in the particular case at

15  hand."  Pearson v. Callahan, 555 U.S. 223, 243 (2009).

16       Because the undersigned finds that defendant did not violate plaintiff's constitutional

17  rights in connection with the medication he prescribed for plaintiff's high blood pressure or the

18  ibuprofen he prescribed for plaintiff's chronic pain, the undersigned does not address the

19  qualified immunity analysis any further with respect to these claims.

20       The undersigned next considers qualified immunity with respect to plaintiff's claim that

21  defendant failed to prescribe medication that adequately managed plaintiff's chronic pain.  Taking

22  the facts in the light most favorable to plaintiff, the undersigned finds that defendant potentially

23  violated plaintiff's constitutional rights when he discontinued plaintiff's tramadol prescription

24  and thereafter failed to prescribe another drug that adequately managed plaintiff's chronic pain.

25  Taking the facts in the light most favorable to plaintiff, the record demonstrates that plaintiff

26  suffered severe and constant pain after his tramadol prescription was discontinued on May 24,

27  2010.  The undersigned finds that a reasonable doctor would have known that failing to prescribe

28  plaintiff medication that adequately managed his pain would violate plaintiff's Eighth

1    Amendment rights.  For these reasons, defendant is not entitled to qualified immunity on

2    plaintiff's pain management claim.

3         X.    Conclusion

4         In accordance with the above, IT IS HEREBY RECOMMENDED that defendant's

5    motion for summary judgment (ECF No. 39) be denied with respect to the claim that defendant

6    failed to prescribe pain medication that adequately managed plaintiff's chronic pain.  In all other

7    respects, defendant's motion should be granted.

8         These findings and recommendations are submitted to the United States District Judge

9    assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

10   after being served with these findings and recommendations, any party may file written

11   objections with the court and serve a copy on all parties.  Such a document should be captioned

12   "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

13   objections shall be filed and served within fourteen days after service of the objections.  The

14   parties are advised that failure to file objections within the specified time may waive the right to

15   appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

16   Dated:  February 26, 2016

17

18                                          KENDALL J. NEWMAN
                                            UNITED STATES MAGISTRATE JUDGE
19

20   /wood1589.msj.fr

21

22

23

24

25

26

27

28

42